**In re PENN CENTRAL SECURITIES LITIGATION.**

**Appeal of SHEARSON HAYDEN STONE INC., Bache & Co., Inc., Drexel Burnham & Co., Inc., Loeb, Roades & Co., Paine, Webber, Jackson & Curtis Inc., Wheat, First Securities Inc., Dean Witter & Co., Inc., E. F. Hutton & Co., Inc., Hornblower & Weeks-Hemphill, Noyes Incorporated, Merrill Lynch, Pierce, Fenner & Smith Inc., Reynolds Securities Inc., L. F. Rothschild & Co., and Thompson & McKinnon, Auchicloss Kohlmeyer Inc.**

**No. 76–2139.**

United States Court of Appeals, Third Circuit.

Argued April 1, 1977.

Decided Aug. 5, 1977.

---

David Berger, Sherrie R. Savett, Jay Robert Stiefel, Philadelphia, Pa., David Berger, P. A., of counsel, for plaintiffs-appellees, Class of Shareholders of Penn Central Co.

White, McElroy, White, Sides & Rector, B. Thomas McElroy, Peveril O. Settle, III, Dallas, Tex., for plaintiffs-appellees, appellees, Class of Shareholders of Great Southwest Corp.

Philip M. Hammett, James D. Crawford, Sterling H. Schoen, Jr., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellants.

Before VAN DUSEN, GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

### I

This is an appeal by Shearson Hayden Stone, Inc., Bache & Co., Inc., Drexel Burnham & Co., Inc., Loeb, Roades & Co., Paine, Webber, Jackson & Curtis Inc., Wheat, First Securities Inc., Dean Witter & Co., Inc., E. F. Hutton & Co., Inc., Hornblower & Weeks-Hemphill, Noyes Incorporated, Merrill Lynch, Pierce, Fenner & Smith Inc., Reynolds Securities Inc., L. F. Rothschild & Co. and Thompson & McKinnon, Auchicloss Kohlmeyer Inc. (the Brokerage Houses), from a final order of the United States District Court for the Eastern District of Pennsylvania denying the motion of the Brokerage Houses for reimbursement of the costs they incurred in locating and sending class action settlement notices to the beneficial owners of stock held by the Bro-

kerage Houses in street name[1] during a period relevant to the settlement. We reverse and remand for further proceedings.

The underlying class action grows out of the failure of the Penn Central Transportation Company. Following the filing of the Penn Central petition for reorganization in June of 1970 a number of suits were filed by stockholders of various companies affected by the reorganization, alleging various violations of federal securities laws and state common law fiduciary obligations. In June of 1971 the Judicial Panel on Multidistrict Litigation transferred all of these suits to the Eastern District of Pennsylvania. *See In re Penn Central Securities Litigation,* 322 F.Supp. 1021 (Jud.Pan.Mult. Lit.1971); *In re Penn Central Securities Litigation,* 333 F.Supp. 382 (Jud.Pan.Mult. Lit.1971). In 1973 the district court approved the stockholders' suits for class action treatment, defining five separate plaintiff class entities. The defendants thereafter negotiated a so-called "global settlement" with the class action representatives, calling for the payment of approximately $8.7 million to the five plaintiff classes, and the surrender by some defendants of shares of common and preferred stock in some of the affected corporations. The district court made an equitable division of the $8.7 million cash fund among the five classes. *See In Re Penn Central Securities Litigation,* 416 F.Supp. 907, 911, 912 (E.D.Pa. 1976).

On August 22, 1975, the district court, *ex parte* insofar as the Brokerage Houses are concerned, entered Post Settlement Order Numbers One and Two, which amended the definition of the plaintiff classes to include: (1) "[a]ll persons who between September 5, 1967, and June 21, 1970, bought, sold or held the common stock of the Penn Central Company, Pennsylvania Railroad Company or New York Central Company," and (2) "[a]ll persons who between January 1, 1965 and August 31, 1972, bought, sold or held the common stock of Great Southwest Corporation." The orders directed that, within ten days, the Brokerage Houses mail a "Notice and Proof of Claim Form" regarding the settlement to all persons in each defined class on whose behalf they had held stock in street name. The orders provided that the Brokerage Houses could reproduce copies of the Notice and Proof of Claim Form, or obtain copies of the Form from the district court, and that they would be reimbursed for "reasonable postage expenses incurred in connection with [the] mailing."

To comply with the district court's order, the Brokerage Houses individually performed research to identify and locate the stockholders whose shares they had held in street name during the relevant period, made sufficient copies of the Notice and Proof of Claim Form to send to those stockholders so located and identified, and mailed out the Forms to those stockholders. In so doing, the Brokerage Houses incurred aggregate costs for such research, copying and mailing totalling $24,106.03. Thereafter, each Brokerage House filed with the district court a Proof of Claim Form seeking reimbursement out of the class settlement fund for their expenses. The Proof of Claim Forms identify separately for each Brokerage House its copying costs, its mailing costs and its research costs. For each Brokerage House the largest expense item was its research costs, which involved a computerized search through old records for the names and addresses of stockholders included in the classes as defined in the district court's orders.

The notice form of the proposed settlements fixed November 3, 1975, for a hear-

---

1. The holding of stock in street name refers to the practice whereby a brokerage house registers its name on securities left with it by its customers. Under this practice the brokerage house is known as the record holder of the stock and the actual purchaser of the stock is known as the beneficial owner. *See generally* SEC Street Name Study, Preliminary Report of Dec. 4, 1975, CCH Fed.Sec.L.Rep.No.619, Part II, at 1–2 (December 11, 1975); Final Report of the Securities and Exchange Commission of the Practice of Recording the Ownership of Securities in the Records of the Issuer in Other Than the Name of the Beneficial Owner of such Securities Pursuant to Section 12(m) of the Securities Exchange Act of 1934, CCH Sec.L.Reps. No.672, Part II (December 15, 1976) ("Street Name Study II").

ing on the fairness and adequacy of the proposed settlements. At that hearing, attorney Philip M. Hammett entered an appearance on behalf of the Brokerage Houses and requested reimbursement on their behalf for their research, copying and mailing costs incurred in complying with the court's order of August 22, 1975. Though the district court heard argument on the Brokerage Houses' application for reimbursement, it did not rule on the application at that time. Instead, it suggested that the Brokerage Houses wait until the plaintiff classes filed a motion for distribution of the settlement proceeds and, at that time, the Brokerage Houses file a motion to share in the distribution of the proceeds, which would then be considered by the court. Apparently, the Brokerage Houses' Proofs of Claim, referred to above, which were on file with the court, were viewed as complying with the court's suggestion that the Brokerage Houses file a motion to share in the distribution of the settlement proceeds.

On June 21, 1976, the district court, in a lengthy opinion devoted primarily to the issue of attorney's fees, ruled on the application of the Brokerage Houses for reimbursement of their mailing, copying and research expenses:

Finally we come to the request of a number of brokerage houses for reimbursement of their costs in forwarding the class action notices to the beneficial owners of the stock involved. This is stock which the brokerage houses held in "street name."

Nothing the brokers have pointed to in their brief convinces us that the class fund should bear the costs of forwarding the documents involved. Neither trade custom nor the inapposite holding of the Supreme Court in *Eisen IV, supra* [417 U.S.] at 179 [94 S.Ct. 2140], overcomes the very obvious and common sense logic that if the brokers are to be reimbursed, it should come—if at all [38]—from the individual beneficial owners involved—not the entire class. There is simply no reason to require the entire class to pay for the choice of a few to have their stock held in street name.

[38] We are not faced with, and do not decide, the obligation of the beneficial owner *vis a vis* the brokerage houses which held the stock in street name.

*In Re Penn Central Securities Litigation*, 416 F.Supp. 907, 921 (E.D.Pa.1976) (footnote omitted). In a separate order accompanying its opinion the court states:

"(32) The motion of Shearson, Hayden, Stone, Inc *et al* for reimbursement of costs is DENIED."

The effect of the order is to deny reimbursement both for the costs of research and for the costs of reproduction and postage. No explanation is given for the inconsistency of the June 21, 1976 order with that of the August 22, 1975 order, which advised the Brokerage Houses that they would be reimbursed for "reasonable postage expenses."

II

In defending the district court's ruling, the plaintiff class representatives contend that the "reasonable effort" requirement for notice to the class set forth in Fed.R. Civ.P. 23(c)(2) [2] and elaborated upon by the Supreme Court in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (*Eisen IV*), was met by (1) mailing individual copies of the Notice and Proof of Claim Form to all record owners of the stock (the Brokerage Houses), and (2) by providing the Brokerage Houses with the means of obtaining additional copies of the Forms for forwarding to the beneficial owners. From this they conclude that the court's *ex parte* order directing communication by the Brokerage Houses with the beneficial owners was valid, and that the expenses incurred by the Brokerage Houses in complying with that order need not be reimbursed. But, even assum-

2. Fed.R.Civ.P. 23(c)(2) provides in part:

In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified *through reasonable effort.* (emphasis added).

ing arguendo the validity of the initial premise, the asserted conclusion does not necessarily follow. Had the court done no more than provide for notice to the record owners, the Brokerage Houses would be in an entirely different position. Each could have exercised its own independent judgment as to whether it had any legal obligation or business reason for undertaking the expense of providing individual notice of the settlement proceedings to the beneficial owners. Instead, the court, at the behest of the settling parties, ordered the Brokerage Houses to incur such expenses, even though the plaintiff class representatives now suggest that such an order was not required by Rule 23(c)(2).

 The district court's reasoning is equally flawed in suggesting, as a reason for imposing the costs on the Brokerage Houses, that "[t]here is simply no reason to require the entire class to pay for the choice of a few to have their stock held in street name." 416 F.Supp. at 921. There may not be any reason to require the entire class, or anybody at all, to bear additional notice expense if notice to record owners would meet the requirements of Rule 23(c)(2). But the fact remains that the court chose to direct that such notice be given. Evidently it saw some advantage in the procedure adopted. We suspect that the additional notice provision was insisted upon by the settling defendants out of an abundance of caution in order to be certain of the maximum judgment preclusion effect of the settlement. The interests of the settling defendants with respect to notice of the settlement proceedings is significant. The court's failure to appreciate the significance of that interest accounts, most likely, for its decision to place the expense of such notice on the Brokerage Houses, and not consider other alternatives. Assuming individualized notice to beneficial owners was either necessary or desirable, the costs could have been imposed (1) out of the entire settlement fund, on the theory that more adequate notice gave the defendants greater safety and thus facilitated their willingness to enter into the settlement; (2) on the defendants (who might then have offered

less) since the additional notice was primarily for their benefit; (3) out of that part of the settlement fund being paid to stockholders who had chosen to register their stock in street name, because their choice caused the additional expense; or (4) on the Brokerage Houses. In light of the court's summary treatment of the issue, only the last alternative appears to have been seriously considered.

It is no answer to the Brokerage Houses' objections that the district court "[did] not decide, the obligation of the beneficial owner *vis a vis* the brokerage houses which held the stock in street name." 416 F.Supp. at 21 n. 38. The court did, by directing the mailing of the Notice and Proof of Claim Form, substantially alter the position of the Brokerage Houses and the beneficial owners. Had no such order been made, the Brokerage Houses would have been in the position of deciding themselves whether they should file proofs of claim on behalf of their former clients, obtain the settlement funds, and then seek reimbursement of their expenses from their customers as a pre-condition to release of the settlement funds. By the court's *ex parte* action they lost that option. Instead, the beneficial owners will file individual proofs of claim, and receive individual payments, and the Brokerage Houses will now have only the wholly illusory alternative of seeking individual reimbursements, from thousands of present and former customers, of sums which separately are insignificant, though collectively substantial.

The plaintiff class representatives answer this last objection by urging that, as a matter of law, the Brokerage Houses which have offered street name registration services to their customers should not be entitled, now or in the future, to any reimbursement of their notice costs. They urge that because the securities industry derives some benefits from the practice of holding shares in street name, the costs of individualized notice to beneficial owners in class actions should be considered as a part of the industry's overhead expense. So to hold, however, would be to put class action notices in a favored position when compared

with proxy solicitations, and would appear to be contrary to the industry practice. Securities and Exchange Commission Rule 14a–3(d), 17 C.F.R. § 240.14a–3(d) (1976), provides that an issuer shall upon request of a street name holder pay the reasonable expense of mailing proxy materials.[3] New York Stock Exchange Rule 451(a)(2) qualifies a member organization's obligation to forward proxy materials upon assurance that the proxy solicitor shall reimburse the member organization "for all out-of-pocket expense, including clerical expenses, incurred . . . in connection with such

solicitation." C.C.H. New York Stock Exchange Guide ¶ 2451 at p. 3805. The Rules of Fair Practice of the National Association of Securities Dealers, contains a similar rule.[4] S.E.C. Street Name Study II, pointing to the importance of the street name practice in facilitating clearance and settlement of securities transactions, observes that 84 percent of the brokers participating in the study sought reimbursement for forwarding notices to beneficial owners of shares held in street name.[5] The study suggests no change in the industry practice in this respect.

---

3. (d) If the issuer knows that securities of any class entitled to vote at a meeting with respect to which the issuer intends to solicit proxies, consents or authorization are held of record by a broker, dealer, bank or voting trustee, or their nominees, the issuer shall inquire of such record holder whether other persons are the beneficial owners of such securities and, if so, the number of copies of the proxy and other soliciting material and, in the case of an annual meeting at which directors are to be elected, the number of copies of the annual report to security holders, necessary to supply such material to such beneficial owners. The issuer shall supply such record holder with additional copies in such quantities, assembled in such form and at such a place, as the record holder may reasonably request in order to address and send one copy of each to each beneficial owner of securities so held and shall, upon the request of such record holder, pay its reasonable expenses for completing the mailing of such material to security holders to whom the material is sent.

17 C.F.R. § 240.14a–3(d) (1976).

4. Interpretation .05 of § 1, Art. II of the NASD Rules of Fair Practice entitled "Forwarding of Proxy and Other Material," provides in part:

FORWARDING OF PROXY AND OTHER MATERIALS

*Introduction*

.05 A member has an inherent duty in carrying out high standards of commercial honor and just and equitable principles of trade to forward all proxy material, annual reports, information statements and *other material required by law to be sent to* stockholders periodically, which are properly furnished to it by the issuer of the securities to each beneficial owner of shares to that issue which are held by the member for the beneficial owner thereof. For the assistance and guidance of members in meeting their responsibilities, therefore the Board of Governors has promulgated this interpretation. The provisions hereof shall be followed by all

members and failure to do so shall constitute conduct inconsistent with high standards of commercial honor and just and equitable principles of trade in violation of Article III, Section 1 of the Rules of Fair Practice of the Association.

*Interpretation*

Section 1. No member shall give a proxy to vote stock which is registered in its name, except as required or permitted under the provisions of Section 2 or 3 hereof, unless such member is the beneficial owner of such stock.

Section 2. Whenever a person soliciting proxies shall timely furnish to a member

(1) sufficient copies of all soliciting material which such person is sending to registered holders, and

(2) satisfactory assurance that he will reimburse such member for all out-of-pocket expenses, including reasonable clerical expenses incurred by such member in connection with such solicitation, such member shall transmit promptly to each beneficial owner of stock of such issuer which is in its possession or control and registered in a name other than the name of the beneficial owner all such material furnished.

\* \* \* \* \* \*

Section 4. A member when so requested by an issuer and upon being furnished with:

(1) sufficient copies of annual reports, information statements *or other material required by law to* be sent to stockholders periodically, and

(2) *satisfactory assurance that it will be reimbursed by such issuer for all out-of-pocket expenses, including reasonable clerical expenses*, shall transmit promptly to each beneficial owner of stock of such issuer which is in its possession and control and registered in a name other than the name of the beneficial owner all such material furnished.

C.C.H. NASD Manual ¶ 2151, at p. 2038–3–39.

5. See note 1 *supra*, Street Name Study II at 21 Section (f).

**1144**

A reason for treating class action notices differently from proxy solicitations, the plaintiff class representatives suggest, is that imposing the added cost of notice resulting from the street name practice upon class action plaintiffs may impede the effectiveness of the class action as a device for the vindication of the rights of the small investor. There are several answers to this contention. One is that the competing policies of encouraging class action litigation on behalf of small claimants, and of requiring class representatives to shoulder the initial cost of notice, were weighed by the Supreme Court in *Eisen IV.* There, the Court did not rule on the precise problem presented by the street name practice, but in concluding that the class representative had to bear the cost of notice in the first instance, it rejected an interpretation of Rule 23 generally favorable to the facilitation of class action lawsuits. But an answer more directly on point with this case is that we are dealing not with the minimum notice required by *Eisen IV* in order for the class

action initially to proceed, but with an additional notice concerning proposed settlements. No persuasive argument has been made that the Brokerage Houses should be made to bear the additional expense of facilitating settlements; or indeed that, of the several alternatives for allocation of the street name notice costs, the one chosen by the district court will be any more likely than the others to facilitate the future use of the class action device.

Finally, the plaintiff class representatives urge that Fed.R.Civ.P. 34 [6] provides authority for the imposition on the Brokerage Houses of the cost of giving settlement notice to the class. In support of this position they rely on the recent *in banc* decision in *Sanders v. Levy,* 558 F.2d 636, 75–7611 (2d Cir., 1977). In that case a divided court held that Oppenheimer Fund, Inc., a defendant in a class action suit, could be compelled under Rule 34 to retrieve from its computerized records the names and addresses of over 100,000 of its own shareholders who had purchased their shares during

---

**6.** *Rule 34. Production of Documents and Things and Entry Upon Land for Inspection and Other Purposes.*

*(a) Scope.* Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served; or (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated object or operation thereon, within the scope of Rule 26(b).

*(b) Procedure.* The request may, without leave of court, be served upon the plaintiff after commencement of the action and upon any other party with or after service of the summons and complaint upon that party. The request shall set forth the items to be

inspected either by individual item or by category, and describe each item and category with reasonable particularity. The request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts.

The party upon whom the request is served shall serve a written response within 30 days after the service of the request, except that a defendant may serve a response within 45 days after service of the summons and complaint upon that defendant. The court may allow a shorter or longer time. The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for objection shall be stated. If objection is made to part of an item or category, the part shall be specified. The party submitting the request may move for an order under Rule 37(a) with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested.

*(c) Persons not parties.* This rule does not preclude an independent action against a person not a party for production of documents and things and permission to enter upon land.

As amended Mar. 30, 1970, eff. July 1, 1970. Fed.R.Civ.P. 34.

the relevant class period and were members of the proposed class. The court held that although design and use of a computer retrieval program to cull out those names would cost the defendant $16,000, those names and addresses were a proper subject matter of discovery, and the district court did not abuse its discretion under Fed.R. Civ.P. 26(c) in declining to shift that expense to the plaintiff class representatives. The court left open the possibility that the defendant could recover the $16,000 as costs taxed against the plaintiffs if they proved to be unsuccessful in the suit.

Reliance on Rule 34, and on *Sanders v. Levy,* is misplaced. Rule 34 and the holding in *Sanders v. Levy* are limited only to "parties" to the suit in question. The plaintiff class representatives urge, however, that the Brokerage Houses should, in this case, be treated as parties, since as street name record owners they were theoretically members of the plaintiff class. Entirely aside from the fact that the court order for notice to the beneficial owners in effect put the street name record owners outside the class and substituted the beneficial owners, we think that such a construction of the term "party" in Rule 34 would be strained. The Advisory Committee Note on the 1970 revision to Rule 34 makes clear that although the revision makes information in computer memory storage discoverable, the Rule still applies only to parties in the conventional sense.

> *Subdivision (c).* Rule 34 as revised continues to apply only to parties. Comments from the bar make clear that in the preparation of cases for trial it is occasionally necessary to enter land or inspect large tangible things in the possession of a person not a party, and that some courts have dismissed independent actions in the nature of bills in equity for such discovery on the ground that Rule 34 is preemptive. While an ideal solution to this problem is to provide for discovery against persons not parties in Rule 34, both the jurisdictional and procedural problems are very complex. For the present, this subdivision makes clear that

> Rule 34 does not preclude independent actions for discovery against persons not parties.

Advisory Committee Note, 48 F.R.D. 487, 527 (1970). Other discovery methods against third parties are available, but were not resorted to in this case. Moreover, even if we were to accept the strained argument which would treat the Brokerage Houses as conventional parties, Rule 34 still would not help for, unlike *Sanders v. Levy,* there was in this case no compliance with the procedural requirements of Rule 34(b). The district court did not purport to act under Rule 34(b) in making its August 22, 1975 *ex parte* order.

Since Rule 34 was not involved in this case in the district court we have no occasion to address the issue (which so sharply divided the Second Circuit) of whether Rule 34 discovery is a method for avoiding some of the impact of the Supreme Court's holding in *Eisen IV* that the class representative must bear the initial cost of notice. We observe, however, that *Sanders v. Levy* dealt with a defendant and its record shareholders, not with Brokerage Houses who held Oppenheimer Fund shares in street name. The issue presented in the case *sub judice* has not been passed upon by the Second Circuit or any other.

■ This case involves no more than the $24,106.03 which the Brokerage Houses incurred in compliance with the August 22, 1975 *ex parte* order. We are aware, however, that both sides have in mind larger stakes. If we were to accept the argument of the plaintiff class representatives that, in Rule 23(b)(3) class actions, the cost of individualized notice to beneficial rather than record owners should be borne by the securities industry, the industry would not collapse. Probably, however, the securities industry would, in determining its future charges, attempt to anticipate the cost of such notice, and pass it on across the board to customers who avail themselves of street name registration. Thus, in a broad sense, the choice that the plaintiff class represent-

atives are urging on us is that all future beneficial owners of securities held in street name bear the cost of notice to those among them who purchase securities which become involved in class action litigation.[7] Certainly, an alternative, if settling defendants insist on notice to beneficial owners, and if class representatives do not bargain for those defendants to bear the added expense, would be to assess the cost against that part of the settlement fund being paid to those shareholders who during the relevant time chose to leave their holdings in street name. Another alternative would be to assess the added cost against the entire settlement fund if the district court were to conclude that the added notice facilitated the overall settlement. In this case, however, we hold only that the district court erred as a matter of law in imposing the cost of notice to the beneficial owners upon the Brokerage Houses. Given that the expense of notice has already been incurred, it will be for the district court on remand to determine what fund, other than monies from the pockets of the Brokerage Houses, must bear this cost.

The order denying the motion of the Brokerage Houses for reimbursement of the cost of sending notice to the beneficial owners of street name securities will be reversed, and the case remanded to the district court for further proceedings consistent with this opinion.

---

7. Brokers could, theoretically, contract with customers individually for reimbursement of class action notices, even after the customer relationship ended. That alternative, while possible, seems unlikely and impracticable when compared to a simple across-the-board cost increase.